## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

SECURITIES AND EXCHANGE COMMISSION,

              **Plaintiff,**

              **v.**

CARL IBERGER & TIMOTHY IBERGER,

              **Defendants.**

_____

:               **Civil Action No.**

:               **JURY TRIAL**
:               **DEMANDED**

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against defendants Carl Iberger and Timothy Iberger (collectively, "the Defendants").

## PRELIMINARY STATEMENT

1.      This case involves illegal insider tipping and trading in the securities of Precipio, Inc. ("Precipio"), a publicly traded Connecticut-based medical diagnostics development company, on the day preceding the company's public announcement on July 30, 2020 that it was launching a COVID-19 business strategy based on a newly executed agreement to distribute a U.S. Food and Drug Administration ("FDA") authorized COVID-19 serology antibody test.  On the day of the announcement, Precipio's common stock closed at $7 per share, an increase of over 400% from its market open price.

2.      Precipio was a medical diagnostics company focused primarily on the development of diagnostic tools to detect the presence of cancer.  With the outbreak of the COVID-19 virus, however, Precipio pursued a new line of business – the distribution of COVID-19 test kits. Between April and July 2020, Precipio negotiated partnerships with two companies for the right

to distribute an FDA-authorized COVID-19 test kit.  During the course of these negotiations, Precipio recruited participants for a test kit validation study by posting notices on its website and Facebook page.  Following this limited solicitation for study participants, Precipio's stock price spiked and closed up 24 percent.  In an email to senior management and the board of directors, Precipio's Chief Executive Officer ("CEO") attributed the price increase to market awareness of the study notices and said, "as I'm sure you've seen, when a company announces anything about COVID, their stock goes bananas."

3.      By the end of May 2020, Precipio had entered an agreement to distribute a COVID-19 test kit that was pending FDA approval.  By the end of June 2020, Precipio had a pricing structure agreement with its ultimate partner to distribute a test kit that had already received FDA authorization.  And, on July 24, 2020, Precipio's CEO informed his entire executive management team that he had reached a distribution agreement in principle to distribute this test kit.

4.      Defendant Carl Iberger was Precipio's Chief Financial Officer ("CFO") and a member of this executive management team.  He was directly involved in Precipio's business plan to distribute FDA-authorized COVID-19 test kits.  He arranged for purchase orders of the test kits for the validation study and to quality check proposed test kits.  Further, once Precipio reached an agreement to distribute a specific FDA-authorized test kit, defendant Carl Iberger provided comments on a draft presentation to Precipio's board of directors about the agreement and later participated in the telephonic board meeting.  He also provided comments on a draft press release to announce its new COVID-19 business strategy and the distribution agreement to the investing public.

5.      In anticipation of the July 30, 2020 press release, Precipio's CEO provided defendant Carl Iberger with instructions on how to handle the expected increase in the company's

stock price.  Precipio had an equity line with an investment bank that allowed the company to sell shares of its stock to raise cash.  On July 29, the day prior to the issuance of the July 30 press release, Precipio's CEO emailed Carl Iberger, "Let's allow the share price to go up tomorrow without too much selling pressure from the EQL [equity line]."  The CEO further instructed Carl Iberger, "if it can, let's let it go to $3."  Carl Iberger responded, "Ok."  As of the end of the trading day on July 29, the closing price for Precipio stock was $1.23.  An increase to $3 per share would have been more than double this closing share price.  Ultimately, however, this expected doubling of Precipio's stock price underestimated the market's reaction to the company's material, non-public information.  Following the public announcement on July 30, the company's stock increased over 400% from its market open price.

6.     Prior to issuance of the July 30, 2020 public announcement, defendant Carl Iberger owed Precipio a duty to protect the confidentiality of its material, nonpublic information concerning the COVID-19 test kit distribution strategy.

7.     As will be explained in further detail below, however, defendant Carl Iberger breached this duty to Precipio by providing material, non-public information to his son, defendant Timothy Iberger and another individual ("Tippee 2")—each of whom knew that that Carl Iberger was the CFO of Precipio.

8.     After receiving material, non-public information, defendant Timothy Iberger and Tippee 2 traded on it by purchasing Precipio stock in advance of the public announcement.  In this way, defendant Timothy Iberger and Tippee 2 reaped the unfair advantage of buying on material, non-public inside information prior to the public announcement of Precipio's COVID-19 business strategy and the resultant price increase.  After the company publicly announced this information

and the stock price rose in response to strong public demand, Timothy Iberger and Tippee 2 received unjust profits from their illicit trading.

9.      By knowingly or recklessly engaging in the conduct described in this Complaint, defendants Carl Iberger and Timothy Iberger violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

10.      The Commission seeks an injunction against future violations, disgorgement of illicit profits, prejudgment interest thereon, and a civil penalty.

## JURISDICTION AND VENUE

11.      The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1].

12.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].  The Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

13.      Venue in this district is proper under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because the acts, practices, transactions and courses of business constituting the alleged securities law violation(s) occurred in substantial part within this district and because defendants Carl Iberger and Timothy Iberger reside in this district.

## DEFENDANTS AND RELEVANT ENTITIES

14.      Carl Iberger, age 69, is a resident of Hamilton, Massachusetts.  From 2016 through March 2022, he served as the CFO of Precipio.

15.     Timothy Iberger, age 38, is a resident of Hingham, Massachusetts.  He is a Senior Director at company that provides business-to-business data and digital services and has been employed there since 2018.  For approximately three years, from 2013 through 2016, Timothy Iberger was employed by Nasdaq, Inc., the owner of the Nasdaq stock exchange, as a Sales Director.  While working at Nasdaq, he received training on securities law compliance, including restrictions on sharing material, non-public information.

16.     Precipio, Inc., a Delaware company with a principal place of business in New Haven, Connecticut, is a medical diagnostics company.  Precipio stock is registered with the Commission and trades on the Nasdaq exchange under the symbol PRPO.  Until approximately the end of 2016, Precipio had been a privately-held company.  In October 2016, Precipio merged with Transgenomic, Inc., a company whose stock was publicly traded on the Nasdaq exchange under the ticker symbol TBIO.  After the merger, the combined company retained the name Precipio and its shares traded on Nasdaq exchange under the symbol PRPO.

## FACTUAL ALLEGATIONS

17.     At the beginning of 2020, Precipio was an early stage public company that was financially unstable, dependent on investor and lending capital, and had trouble maintaining a stock price high enough to meet its stock market's listing requirements.

18.     While the company had developed some cancer diagnostic products, the sales of these existing products did not generate enough income to pay the company's substantial expenses.

19.     As explained in Precipio's 2019 Annual Report, the company's years of development activities without sufficient income to cover its substantial expenses meant that it had steadily incurred substantial operating losses.

20.     The company was not current in making payments to all of its lenders and vendors.

21.     It survived financially by, among other things, raising money from investors and borrowing money.

22.     As of the end of 2019, the company told investors that it expected to continue incurring "substantial net losses for the foreseeable future to develop and commercialize our diagnostic technology."

23.      In early 2020, Precipio's stock price was so low that it jeopardized the company's listing on the Nasdaq market.

24.     One of the requirements for Precipio to remain listed on the Nasdaq stock market was to have a minimum closing bid price of $1.00.  From March 18 through April 29, 2020, Precipio's stock price failed to meet this threshold requirement.

25.     On April 29, 2020, Precipio received written notice from Nasdaq that its stock had failed to meet this threshold and risked being delisted from the market.  Due to the extraordinary market conditions caused by the COVID-19 pandemic, Nasdaq agreed to a tolling of the compliance period to give Precipio 180 days or until December 28, 2020 to regain compliance with the minimum bid price requirement.

A.     **Precipio's Business Strategy and Pursuit of an FDA-Authorized COVID-19 Test Kit**

26.     The outbreak of the novel coronavirus, COVID-19, began in China in approximately December 2019 and quickly spread around the world, including into the United States.

27.     By April 2020, the outbreak and government measures taken in response caused a significant impact on businesses and commerce.

28.     As described in Precipio's Form 10-Q for the first quarter of 2020, which defendant Carl Iberger signed, "the spread of COVID-19 [had] created a worldwide humanitarian and economic crisis.  The events . . . [were] in many ways unprecedented, with large-scale quarantines,

border closings, school closings and physical distancing.  Governments and communities [had] been jolted into action to 'flatten the curve.'"

29.     COVID-19 vaccines were under development, but none were available to the American public.  The FDA would not issue its first authorization for a COVID-19 vaccine until December of 2020.

30.     Beginning in April 2020, Precipio modified its business strategy to enter the market for COVID-19 testing.  And, between April and July 2020, Precipio negotiated with two companies to distribute and sell a COVID-19 test kit that received FDA-authorization.

31.     In order for a medical device, such as a COVID-19 testing kit, to be sold or used in the United States, it must be evaluated by the FDA.  In normal circumstances, the medical device cannot be sold or used in the United States without full approval from the FDA.  In early 2020, however, the U.S. Secretary of Health and Human Services determined that the COVID-19 virus pandemic was a public health emergency and invoked the FDA's statutory authority to grant Emergency Use Authorization ("EUA") to authorize the emergency use of certain unapproved medical products, including serology tests for COVID-19.  Accordingly, in order for Precipio to market and sell a COVID-19 test in the United States, it needed to collaborate with a company whose test kit had or would soon receive such an FDA authorization.

32.     At the beginning of April 2020, Precipio started discussions with Company A, a Nebraska-based private company, to market and distribute COVID-19 test kits produced by a Japanese supplier.  Precipio's negotiations advanced as far as discussions of test kit pricing, but the negotiations died out later in that month because the proposed test kit failed to receive EUA.

33.     In mid-April, Precipio started negotiating a potential partnership with a South Korean company to distribute its COVID-19 antibody test kit.  For the next few months, Precipio

assisted the South Korean company's efforts to obtain EUA for the test kit, including conducting a U.S.-based validation study of several hundred participants.  Precipio recruited participants for the study by posting notices on its website and Facebook pages.  Shortly after posting these notices, Precipio's stock price spiked on May 21, 2020, rising from an opening price of $0.73 per share to a high of $1.40 per share and closing at $0.91 per share.  That evening, Precipio's CEO emailed company executives, including Carl Iberger, and the company's board of directors concerning the stock price movement.  The CEO stated:  "As you may have seen, our stock price got a nice bump today . . . and the volume was tremendous.  The reason (we believe) for this was that word got out about our COVID-19 study, and as I'm sure you've seen, when a company announces anything about COVID, their stock goes bananas."

34.    Defendant Carl Iberger was directly involved in the exploration of Precipio's potential partnership with the South Korean company.  For example, between April and July 2020, he arranged for purchase orders of the test kits for the validation study.  Although Precipio initially signed a distribution agreement with the South Korean company at the end of May 2020, the parties ended their agreement in July after the test kit failed to receive EUA.

35.    While the South Korean company distribution agreement was still in play, Company A announced in June 2020 the availability of a new COVID-19 test kit that had received EUA from the FDA.  Within days, Precipio and Company A restarted their discussions about a potential partnership concerning this FDA-authorized test kit, and Precipio expressed strong interest in partnering as the distributor of these test kits in the United States.  By the end of June, the parties agreed on a pricing structure for Company A to sell test kits to be distributed by Precipio.

36.    On or about July 24, 2020, Company A sent Precipio's CEO a draft distribution agreement.  On the same day, the CEO informed senior management, including defendant Carl

Iberger, of the proposed distribution agreement.  The CEO also sent a draft two-page presentation to the board of directors discussing the proposed distribution and recommending issuance of a press release "that week."

37.     Four days later, on July 28, 2020, Precipio and Company A signed a distribution agreement.  Precipio's CEO then circulated a draft press release and a revised draft board presentation concerning the agreement to executive management, including defendant Carl Iberger. On the same day, defendant Carl Iberger was present on a telephonic board meeting with Precipio's board of directors during which the CEO explained Precipio's new partnership with Company A to distribute the FDA-authorized COVID-19 test kit.

38.     Two days later, at 10:15 a.m. on the morning of July 30, 2020, Precipio issued a press release publicly announcing, for the first time, its COVID-19 strategy and the agreement to distribute Company A's serology test kit.

39.     By the end of the trading day, Precipio's stock price increased over 411% to close at $7.00 per share on elevated daily trading volume of over 97 million shares traded.  In comparison, the average daily trading volume for Precipio's stock over the previous 20 days had been approximately 1.3 million shares per day.

**B.     Carl Iberger Possessed Precipio's Material Non-Public Information and Was Aware of Duty to Keep It Confidential**

40.     Precipio's employee handbook prohibited tipping or trading based on the company's material non-public information.  As an employee of Precipio, Carl Iberger was provided a copy of the handbook and signed an acknowledgement that he was responsible for becoming familiar with the policies and rules set forth in the handbook and abiding by them.

41.     The handbook defined "various categories of information that are particularly sensitive and, as a general rule, should always be considered material."

42.     The categories of material information included (i) "[n]ews of, or development in, strategic partnerships, joint ventures, collaborations or other relationships;" and (ii) "[g]ain or loss of a significant customer or supplier."

43.     Precipio's employee handbook also noted that "[a]ny information that could be expected to affect the market price of the Company's securities, whether such information is positive or negative, should be considered material."

44.     Defendant Carl Iberger was aware of Precipio's COVID-19 business strategy and was closely involved with the corporate activities that led to the July 2020 announcement of the agreement with Company A to distribute the FDA-authorized test kits.  This involvement included approving purchases of test kits for a Company A's validation study, providing comments on a draft board presentation and the press release announcing the deal, attending the telephonic board meeting, and providing input on the timing of the press release.

**C.     Carl Iberger Knew His Son Timothy Traded Stocks, Including Precipio and Shared Details of Inside Corporate Information With Him**

45.     Carl Iberger talked in detail about finances with Timothy, including stock trading advice and suggesting Precipio as an investment.

46.     For example, in April 2020, after Timothy shared news of a work bonus with his father, Carl advised his son to put 30% of the bonus "in the market."

47.     A few days later, Timothy and Carl shared following text message exchange regarding the stock market investing:

> *Timothy*:   I learned today that you can only transfer 100k per day to etrade. Thank you for getting me here.
>
> *Carl*:   Nice problem to have.  You can trade in 208 minutes.
>
> *Timothy*:   3 day holding period to invest.
>
> *Carl*:   Always some hurdles.
>
> *Timothy*:   Airlines, cruises, auto, index?

48.     Timothy then sent his father a picture of the dollar amount of the bonus he received. After texting a picture of this amount, their exchange turned to investing in Precipio:

> *Carl*:       Precipio? Ha
> *Timothy*:   Looking forward to the pop!
> *Carl*:       Ditto
> *Timothy*:   I'm averaging down after the split(s)
> *Carl*:       Ok. Nonbeliever
> *Timothy*:   I'm a penny stock believer.

49.     Timothy Iberger's comment about "averaging down" was an understatement. Three years earlier, in May 2017, Timothy Iberger had spent $3,000 to purchase 10,000 shares of Precipio's predecessor entity, Transgenomic, at $0.30 per share.  Following completion of the merger, those shares were renamed under the merged entity's name, Precipio, and its ticker symbol, PRPO.  And, approximately three years later in April 2020, the market value of those shares had dropped to about $15 – almost a total loss.

50.     In June and July 2020, Carl and Timothy continued to text about stock trading, including specific discussions about Precipio.  Carl provided Timothy guidance on when to anticipate a buying opportunity for Precipio and gave inside information about Precipio's corporate activities.

51.     On June 6, Carl and Timothy exchanged the following messages:

> *Carl*:       Hear your (sic) killing it in the market
> *Timothy*:   Made $150k betting against corona.
> . . . .
> *Timothy*:   When do I buy PRPO?
> *Carl*:       Soon.  July
> *Timothy*:   PPS estimate in december?

52.      On June 30, Carl Iberger texted Timothy:

> *Carl*:     Where have you gone Danny Boy? How are you?
> We had a good week at work.
> Got out of NASDAQ noncompliance jail. That was good
> Sales continue to increase. That's good
> And we're progressing w/FDA on new testing . . . so for 1 week all's good.
> . . .

53.     A week later, they texted about Precipio again:

> Timothy:   PRPO moving in the right direction.

> Carl:      Yes.  We're getting our legs under us.  Still in ICU.  But off vent.

## D.   In Last Week of July 2020, as Precipio Closed on Its Distribution Agreement, Carl and Timothy Spoke By Phone, and Timothy Made a Well-Timed and Unusually Large and Concentrated Purchase of Precipio Stock

54.     During July 2020, Timothy and Carl Iberger's texted each other a number of times early in the month, but they did not have any voice calls by cell phone until July 27, 2020.

55.     Their first voice call during the month of July occurred at 8:32 p.m. on Monday, July 27, 2020, and they spoke for 14 minutes.  By the time of this call, Carl Iberger knew that Precipio's CEO had told senior managers that he had reached an agreement in principle to distribute Company A's test kits at $6 per test, and had also distributed a draft board presentation recommending that the company issue a press release announcing the COVID-19 strategy and partnership "this week."

56.     Carl and Timothy spoke by phone again on July 28, 2020.  They had two calls.  One at approximately 5:24 p.m. that lasted three minutes, and another call at approximately 8:08 p.m. that lasted approximately two and a half minutes.  By the time of these calls, Carl Iberger knew Precipio and Company A had signed the distribution agreement that was the foundation of Precipio's COVID-19 business strategy.  Indeed, earlier that day, Carl Iberger had participated in Precipio's telephonic board of directors meeting during which Precipio's CEO informed the board

of the signed agreement and the company's intention to issue a press release announcing the agreement and Precipio's business strategy.

57.     On the next day, July 29, at 9:39 a.m., Timothy Iberger placed a market order to purchase 25,000 shares of Precipio, which was executed that day at $1.25 per share, at a total cost of $31,250.

58.     This purchase of Precipio stock was his first in over three years.  His last purchase of $3,000's worth of TBIO shares – which became PRPO – had resulted in an almost total loss.

59.     As noted above, Timothy Iberger described himself as a "penny stock believer."

60.     In terms of price, a penny stock is generally defined as a stock that trades below five dollars per share.

61.     Timothy Iberger's trading records show that he had previously traded ten other stocks with prices lower than five dollars per share.  His individual purchases of these stocks had all been less than $10,000.  By contrast, Timothy's Precipio purchase on July 29, 2020 was $30,000 or at least three times larger than any previous single day purchases of low-priced stocks.

62.     In addition, although Timothy Iberger had previously held aggregate positions greater than $10,000 in stocks priced less than five dollars per share, he accumulated these aggregate positions over periods of weeks and months.  Timothy's Precipio purchase on July 29, 2020 was the first time he had risked amassing a holding of over $10,000 in a low-priced stock on a single day, rather than gradually accumulating positions over time.

63.     Further, as explained below, Timothy Iberger's purchase happened on the same day as a purchase by Tippee 2, who had little interest in stock trading, and who purchased Precipio stock only after receiving funding and prompting from, Carl Iberger.

64.     Timothy Iberger made this unusually large and concentrated purchase of Precipio stock on July 29, 2020 because his father had tipped him with Precipio's material, non-public information concerning the launch of its COVID-19 business strategy and the distribution agreement with Company A.

65.     Prior to Timothy's July 29 purchase, Carl Iberger tipped Timothy with Precipio's confidential, material, nonpublic information.  Carl Iberger tipped Timothy with the intention of making a gift that his son could profit upon by purchasing Precipio stock in advance of the company's public announcement.

66.     At the time Timothy Iberger received the material non-public information, he knew that his father was CFO of Precipio, that his father had no legitimate purpose in providing him with material, non-public information, and that his father was breaching a duty owed to Precipio to keep the information confidential.  Timothy Iberger further knew that his father provided him the material, nonpublic information as an illicit gift to profit upon.

67.     When Timothy Iberger purchased 25,000 shares of Precipio stock on July 29, he traded upon Precipio's material, non-public information.

**E.     Carl Iberger Funded Tippee 2's Brokerage Account, and Tippee 2 Made A Spectacularly Well-Timed Trade In a Securities Account He Had Not Used For Years**

68.     Tippee 2 had a brokerage account in July 2020, but he had not made trades in it for years.

69.     Tippee 2 was not particularly interested in trading stocks.

70.     Indeed, it had been so long since Tippee 2 had traded in this account that he had forgotten the username and password to gain online access to his account.

71.     On July 28, the same day that Precipio and Company A signed their distribution agreement, Carl Iberger electronically transferred $2,700 to a bank account jointly owned by him and Tippee 2 for the purpose of Tippee 2 using this money for stock trading.

72.     In turn, Tippee 2 initiated an electronic transfer of the $2,700 from this joint bank account to his brokerage account.

73.     At 1:27 p.m., Carl Iberger texted Tippee 2 a two-word message:  "call me"

74.     Ten minutes later, Tippee 2 called Carl Iberger and they had a conversation that lasted approximately four and a half minutes.

75.     At 3:11 p.m., Tippee 2 called Carl Iberger a second time and they had a conversation that lasted approximately a minute.

76.     In order to gain access to his brokerage account on July 28, Tippee 2 had to use his broker's online system to retrieve his log on information and then reset his password.  Tippee 2 undertook these activities approximately 20 minutes after the second call with Carl Iberger.

77.     On the next day, July 29, at 8:01 a.m., less than 24 hours after receiving Carl Iberger's transfer of $2,700 and subsequently regaining access to his dormant brokerage account, Tippee 2 placed a market order to purchase 450 shares of Precipio stock.  The order was filled at the market open at a price of $1.20 per share for a total cost of $540.  It was the only purchase Tippee 2 made that day.  It was also the first time Tippee 2 had ever purchased Precipio stock.

78.     In purchasing these 450 shares, Tippee 2 used all of the available funds in his brokerage account.  Tippee 2's broker returned the $2,700 that Tippee 2 had attempted to transfer to his brokerage account on July 28.  Tippee 2's brokerage statement noted a possible error in the electronic transfer of funds from his bank account, stating "returned transaction – account could not be located."

79.     Prior to Tippee 2's purchase on July 29, Carl Iberger tipped Tippee 2 with Precipio's material, non-public information concerning its COVID-19 business strategy and the distribution agreement with Company A.

80.     Carl Iberger tipped Tippee 2 with the intention of making a gift that Tippee 2 could profit upon by purchasing Precipio stock in advance of the company's public announcement.

81.     When Tippee 2 purchased 450 shares of Precipio stock on July 29, he traded upon Precipio's material, non-public information.

82.     On August 3, 2020, Carl Iberger took back the $2,700 he had given to Tippee 2. Carl Iberger first texted Tippee 2 that he was taking back the $2,700.  He then used his authority over the joint account to electronically transfer $2,700 to another bank account that he did not share with Tippee 2.

83.     After Carl Iberger texted Tippee 2 that he was taking back the $2,700, Tippee 2 replied:  "Okay yeah that works!  Still nothing in Etrade other than the 450 shares bought at 1.2."

**F.     Tippees Unjustly Profited From Their Illicit, Well-Timed Trades**

84.     On the July 30, 2020, Precipio publicly announced its COVID-19 business strategy and its distribution agreement with Company A.  Following this announcement, Precipio's stock price rose dramatically on a huge volume of trading.  Indeed, the market reaction was so strong that Nasdaq twice halted trading in Precipio's stock due to its price and volume spikes.

85.     As the stock price rose in response to the public demand for the stock, Timothy Iberger and Tippee 2 received unjust profits from their illicit trading.

**CLAIM FOR RELIEF**
**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**

86.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 85 above.

87.     By engaging in the conduct described above Carl and Timothy Iberger, directly or indirectly, acting knowingly or recklessly, in connection with the purchase or sale of securities, by the use of means and instrumentalities of interstate commerce, or of the mails, or of a national securities exchange:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon certain persons.

88.     The conduct of Carl and Timothy Iberger involved fraud, deceit, manipulation, or deliberate or reckless disregard of regulatory requirements and directly or indirectly resulted in substantial losses to other persons.

89.     As a result, Carl and Timothy Iberger violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.     Enter a permanent injunction restraining Defendants Carl and Timothy Iberger and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

B.      Require Defendants Carl and Timothy Iberger to disgorge ill-gotten gains and losses avoided, plus pre-judgment interest;

C.      Order Defendants Carl and Timothy Iberger to pay an appropriate civil monetary penalty pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1];

D.      Enter an order, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78*u*(d)(2), barring Carl Iberger from serving as an officer or director of any issuer required to register securities with the Commission pursuant to Section 12(b) or 12(g) [15 U.S.C. §78*l*(b), 78*l*(g)], or to file reports with the Commission pursuant to Section 15(d) [15 U.S.C. §78*o*(d)], of the Exchange Act;

E.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.      Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

SECURITIES AND EXCHANGE
COMMISSION

By its attorneys,
//s// *Richard M. Harper II*
Richard M. Harper II (MA BBO No. 634782)
Martin F. Healey (MA BBO No. 227550)
Xinyue Angela Lin (MA BBO No. 672786)
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-8979 (Harper)
(617) 573-4590 (Facsimile)
HarperR@sec.gov

Dated:  April 15, 2022